IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action No. |
| v. | ) | 10-00244-01-CR-W-DW |
| | ) | |
| EDWARD BAGLEY, SR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I. BACKGROUND

Before the court are defendant's motions for authorization of funds to retain an expert witness. In his first motion (document number 226)[1] defendant states in part:

> In his report, which he purportedly based on numerous items of discovery provided to him by the government, Dr. Dietz concludes:
>
>> "The evidence that Ed Bagley is a sexual sadist is overwhelming and beyond dispute. Bagley's willingness to indulge his sexual appetite to the detriment of others is accounted for primarily by his personality. . . . Although no information was received regarding Bagley's conduct prior to age 15, he certainly demonstrates the pervasive pattern of disregard for and violation of the rights of others in adulthood characteristic of antisocial personality disorder. . . . Bagley may also be fairly characterized as a psychopath. . . ." See Report of Dr. Park Dietz, p. 108.
>
> Dr. Dietz'[s] "diagnosis" of Mr. Bagley is troubling, not only because of the prejudicial conclusions with which he has labeled Mr. Bagley, but also because Dr. Dietz arrived at his "diagnosis" without the benefit of an interview with the Defendant or the results of any standardized psychological tests or personality assessments. In order to determine whether Dr. Dietz'[s] conclusions contain any degree of reliability, it is necessary for the defense to obtain its own independent psychological evaluation of Mr. Bagley.

In his amended motion (document number 229), defendant states that, "In order to determine whether Dr. Dietz'[s] conclusions contain any degree of reliability, it is necessary for the defense to obtain its own evaluation of Dr. Dietz'[s] report."

---

[1]Defendant's motion is entitled Motion of Defendant Edward Bagley, Sr. for Authorization of Funds to Retain Expert Witness; however, it was docketed as a "Motion for Psychiatric exam of Defendant Edward Bagley, Sr."

1

Finally, in his second amended motion (document number 253), defendant states:

> Defendant originally filed his Motion For Authorization of Funds asking that the court authorize the retention of Dr. Steven Peterson to review the report of the government's expert, Dr. Park Dietz. In that motion, Defendant stated that Dr. Peterson would perform a psychiatric evaluation of Defendant.
>
> Defendant subsequently filed his Amended Motion for Authorization of Funds, with the intention of indicating to the court that Dr. Peterson would not do an evaluation of the Defendant, but would limit his opinion to the reliability of Dr. Dietz'[s] characterization of the Defendant as a psychopath and having antisocial personality disorder and the methodology relied upon in forming such an opinion, given the fact that Dr. Dietz'[s] "diagnosis" of the Defendant was based solely on discovery provided to him by the government . . . .
>
> It is counsel's belief that Dr. Peterson will require 30 to 40 hours to review the evidence provided to Dr. Dietz, evaluate the methodology and reliability of his conclusions with regard to the Defendant's psychiatric state, and prepare his own report. It is estimated that if called as a witness at a hearing on a motion to exclude evidence or at trial, his testimony would take 2 to 3 hours, depending on length of cross-examination.

In its response (document number 230), the government states that:

> The government provided preliminary notice that Dr. Dietz would testify as a criminal forensic psychiatrist and would "testify to the area of grooming/seduction of a victim" and "the differences in BDSM versus criminal sadism."

The government points out that defendant has not filed a notice of intent to rely on a mental disease or defect on the issue of guilt or of punishment.

The questions put to Dr. Dietz by the government consist of the following:

1. What is the medical understanding of the unusual sexual behaviors documented in the evidence in this case?

2. Does the evidence explain how the defendants were able to treat the victim as they did for so long without her calling the police, seeking help, or escaping the situation?

3. Do the facts of this case comport with the BDSM subculture?

The government's response goes on:

> The key contested issues which the jury will be required to make a finding of fact on at trial are: (a) if the sexual acts were commercial; and (b) if they were coerced. Dr. Dietz's report does not speak to these ultimate issues and he will not do so in the course of his testimony. Dr. Dietz does not speak to the defendants's [sic] "mental state or condition constituting an element of the crime charged," as prohibited by Fed. R. Ev. 704(b). If Dr. Dietz were to include in his report or testimony that Defendant Bagley had the requisite

2

mens rea of the offense charged and thereby knowingly recruited, enticed, harbored, transported, the victim and knew that she would be caused to engage in commercial sex acts, his testimony would be prohibited by Fed. R. Ev. 704(b). If the jury had to make a finding of fact on whether the defendant was a sexual sadist or psychopath, this would certainly be an issue that the expert could not speak to in his report or testimony. However, because these findings by the expert only assist the jury in understanding the evidence and determining a fact in the case as outlined below, it is permissible under the Federal Rules of Evidence.

The government states that the jury will be assisted by Dr. Dietz's testimony: (1) as to the "highly unusual sexual behavior" and the "necessary history and medical documentation of sexual sadism", (2) as to why victims who have been groomed over a period of time lack the mental ability to run away and seek help (which is based on the defendants' statements that they intend to argue that the victim was not coerced because she failed to run away or seek help), and (3) on what conduct is appropriately accepted within the rules and regulations of the BDSM lifestyle and what conduct "clearly exceeds the boundaries of this subculture" (which is based on the defendants' statements that they intend to argue that their conduct is simply a part of the BDSM lifestyle).

The last justification for Dr. Dietz's testimony by the government is as follows:

> Finally, Dr. Dietz will offer expert conclusions based on his education, training and experience, with reasonable medical certainty. (Dr. Dietz's Report, p. 108-113). This section includes the paragraph that Defendant Bagley cites and the court inquires about in the order issued. However, Dr. Dietz's conclusions that Defendant Bagley is a "sexual sadist" and that he can be "fairly characterized as a psychopath" do not offer an expert opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. (Dietz's Report, p. 108). Indeed, as Dr. Dietz outlines in his report, many people who are properly characterized as sexual sadists . . . do not commit the acts the defendant is charged with in the indictment. Dr. Dietz's diagnosis does not instruct the jury that the defendant is guilty of the criminal acts charged [or] an element in which they must make a finding of fact. Rather, it educates the jury that while new torture techniques and images of bondage and mutilation are not of value to them, or the average person, they are high value to someone who is a sexual sadist and has a sexual appetite for these behaviors.

This is based on the government's burden of proving that defendant received a "thing of value" in order to establish that the sexual acts were commercial.

To the average juror or individual, receiving new tips and techniques on how to torture someone or images which depict the acts, is not a "something of value." But to someone

3

who is a sexual sadist combined with being a psychopath, there could be no greater item of value. Whether an item received is a "thing of value" is a subjective standard based on proving that the person who received it would value it.

Finally, defendant's reply (document number 238) includes the following:

> The government would like the court to believe that Dr. Dietz'[s] opinions as to the defendant's psychiatric "diagnosis", although obtained improperly, would assist the jury in understanding the evidence at trial. Defendant disagrees.
>
> While it is anticipated that the jury will not be well versed in BDSM behavior, characterizing the defendant as a criminal sexual sadist and psychopath will not contribute to the jury's understanding. On the contrary, any probative value such characterization may carry is far outweighed by the "danger of unfair prejudice, confusion of issues or misleading the jury" and is therefore inadmissible pursuant to Fed. R. Evid. 403.
>
> Nor does it relate to whether or not defendant received "a thing of value" in exchange for sex acts with the complaining witness. Defendant denies the allegation that he did receive anything of value or force the complaining witness to engage in sex acts with others, but points out that expert testimony is not required to determine whether an individual places value on a specific item. The government's suggestion that someone who is a sexual sadist combined with being a psychopath could consider tips and techniques on how to torture someone "something of value" is purely speculative, unhelpful and prejudicial. It does not assist the jury to offer the possibility that the Defendant might consider such things as having commercial value based solely on Dr. Dietz'[s] label of him as a sexual sadist and psychopath. Dr. Dietz'[s] opinions as set forth in his report are nothing more than prohibited Fed.R.Ediv. [sic] 404(a) character evidence with which the government attempts to prove that the defendant acted in conformity with the "diagnosis" rendered by Dr. Dietz.
>
> Furthermore, the government has failed, despite this court's directive, to disclose what specific facts or data relating to the Defendant Dr. Dietz relied on in arriving at his "diagnosis." Nor has it been described what principles or methods were utilized or how they were applied to arrive at said "diagnosis." Dr. Dietz'[s] opinion of Defendant's psychiatric condition is not based on direct evidence. It lacks foundation and relies primarily on hearsay. Therefore, it is of no assistance to the jury and should be determined inadmissible.

## II. THE PROBLEM

As discussed above, defendant seeks CJA funding to hire a psychiatrist to review the expert witness report that the government intends to rely on at trial. This would normally be a relatively simple and routine matter to resolve, requiring an evaluation of the relevance of the defendant's request to the issues likely to be raised at trial and a review of the expert's proposed fees for reasonableness. However, here, the request is complicated because the government's expert

4

witness report arguably raises a number of questions as to the eventual admissibility of the witness's testimony and conclusions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), its progeny, and the Federal Rules of Evidence. Although no motion in limine has yet been filed challenging the anticipated testimony from the government's expert, the parties have nevertheless treated this request as an opportunity to raise and discuss issues under Daubert and Rules 403, 702, 703, and 704.

From my review of the expert report and the applicable law, I believe that there are significant questions over the admissibility of some of the expert's anticipated testimony, as to both its substance and form. With the current February 13, 2012, trial setting, these issues need to be addressed quickly before any intelligent decision can be made about defendant's request for CJA funding for an expert. To the extent the government's expert witness report contains potentially admissible evidence, defendant should be allowed to consult an expert to test and potentially challenge the reliability of that testimony; to the extent the report contains inadmissible evidence and opinions, defendant's funding request should be denied.

### III. THE DIETZ REPORT

The report in question was prepared by Park Dietz, M.D., M.P.H., Ph.D., and is 113 pages in length. Dr. Dietz's resume, a different document, is 75 pages, and recounts his considerable credentials in the area of forensic psychiatry.

For the purpose of this discussion, I am assuming that Dr. Dietz is qualified to testify on at least some of the issues at trial. My focus here is not on his qualifications, but rather on some of the material upon which the doctor relies and would potentially relate to the jury, some of his conclusions and opinions, and the manner in which he intends to present the facts and his opinions to the jury.

Dr. Dietz's report is divided into six sections:

1. The sources of the information the doctor relied upon in forming his opinions (Dietz Report, pages 1-9);

5

2. The offenses charged against the defendants in various indictments (Dietz Report, pages 9-10);

3. The medical understanding of the unusual sexual behaviors documented in the evidence (Dietz Report, pages 10-69);

4. How the defendants were able to treat the victim as they did for so long without her calling the police, seeking help, or escaping the situation (Dietz Report, pages 69-90);

5. The BDSM subculture (Dietz Report, pages 90-108); and

6. Dr. Dietz's conclusions (Dietz Report, pages 108-13).

## A. THE UNDERLYING EVIDENCE FOR THE OPINIONS

Dr. Dietz's report sets forth the material he reviewed before arriving at his opinions, including FBI 302 reports of interview (including those for defendants), computer images, photographs, videotapes, grand jury testimony, the transcript of the detention hearing, the indictment and the superceding indictment, letters (including those by defendants and their lawyers), DSS reports, hospital records, a psychological evaluation, defendants' criminal history information, a plea agreement, and other materials -- some of which may be inadmissible at trial. (Dietz Report, pages 1-9.) However, no effort was made to tie the specific exhibits or statements to the doctor's specific conclusions on the topics of sadism; seduction, grooming and control of the female complainant; or the BDSM subculture.

I acknowledge that an expert witness may rely on inadmissible material when formulating an opinion when those facts are the type reasonably relied upon by experts in the field. Fed. R. Evid. 703. When doing so, however, the trial judge should make the necessary inquiry about (1) whether the material is reasonably relied upon by experts in the field and, if so, (2) whether the inadmissible material is reliable and relevant. The inadmissible material should not be shown to the jury unless the trial judge determines that it would assist the jury in evaluating the expert's testimony, and that it is more probative than unfairly prejudicial. Fed. R. Evid. 403.

Here, there is no way to tell from the report what specific materials are being relied upon to reach the doctor's conclusions much less whether the information relied upon by Dr. Dietz is the type routinely relied upon by experts in formulating opinions in this area of expertise. More troubling, should any inadmissible evidence be imparted to the jury, is the question as to whether the underlying information is more unfairly prejudicial than probative, or can any potential prejudice be adequately neutralized by means of a cautionary instruction.

B.     **MEDICAL UNDERSTANDING OF THE UNUSUAL SEXUAL BEHAVIORS DOCUMENTED IN THE EVIDENCE**

In this section of his report, Dr. Dietz responds to the prosecutor's first question and sets out literature describing sexual sadism, the ways in which sexual sadists cope with their persistent desires, and the factors that make it more likely that a sexual sadist will indulge his desires to the detriment of others. (Dietz Report, pages 10-15.) Thereafter, Dr. Dietz reviews for each defendant "the available evidence that may shed light on the defendant's *willingness* to indulge his desires at the expense of others" (emphasis added). (Dietz Report, page 15.)

After his review of the evidence on this question, Dr. Dietz gives his opinions in the "conclusions" section of the report. Here are some examples of testimony that do not appear to adhere to the requirements of admissibility:

- "Ed Bagley is a sexual sadist".
- He has a "willingness to indulge his sexual appetite to the detriment of others".
- "[H]e certainly demonstrates the pervasive pattern of disregard for a violation of the rights of others in adulthood characteristic of antisocial personality disorder".
- Ed Bagley has demonstrated "repeated lying and conning others for personal profit or pleasure".
- He has "hurt, mistreated, or stolen from another."
- "Bagley may also be fairly characterized as a psychopath".

(Dietz's report, page 108).

- "Stokes is a sexual sadist."

7

- "[H]e does not have a highly developed sense of morality and responsibility".
- He "was willing to exploit [FV] despite his recognizing that she was under Bagley's control and unable to consent to sexual intercourse or torture".

(Dietz's report, page 109).

- "[E]ach of the defendants had knowledge of at least some [vulnerabilities] and had reason to question her capacity to consent to sexual contact, much less torture."
- "They took advantage of her".

(Dietz's report, page 110).

- "Bagley enticed [FV] into sexual slavery".
- "Bagley's transformation of [FV] into his subservient sex slave. . ."
- "[H]e misled her into believing" she was participating in a BDSM lifestyle.

(Dietz's report, page 111).

- The defendants "allowed Bagley to control the scenes, despite their knowledge of [FV]'s vulnerabilities, having good reason to doubt that she could competently consent even in Bagley's absence".
- "Participants in the BDSM subculture who became familiar with Bagley's abuse of [FV] -- including Michael Yoshida, Jerry Dean Shaddy, Roy Woolstrum, Ken Marcus, and Ira Levine -- were each concerned, disapproving, or appalled by Bagley's conduct toward [FV] and his violations of subcultural norms."
- "The ultimate proof that the defendants' activities with Bagley were not 'safe, sane, and consensual' is . . . ."
- "... inflicted by Bagley's torture."

(Dietz's report, page 112).

- "Bagley groomed, coerced, conned, and forced the victim . . . ."
- "[H]e further humiliated and sadistically abused her by causing her to engage in other acts for which he sought and received economic and other benefits."

Federal Rule of Evidence 704 provides that in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. "Those matters are for the trier of fact alone."

8

The quotations listed above make clear that Dr. Dietz's testimony (presumably in line with his report) includes conclusions as to the defendant's knowledge, intent, credibility, and past bad acts. It includes conclusions that the victim did not consent. It includes hearsay statements by co-defendants regarding defendant's conduct toward the victim (some of which may raise Bruton concerns). It includes conclusions that the defendant received economic and other benefits for the sex acts committed by the victim. These are all clearly questions for the jury -- questions that, by their very nature, do not warrant or require the assistance of expert testimony.

These are examples of instances, and there are many others, where the report raises serious questions about whether portions of the doctor's testimony are relevant to any issue in the case under Rules 401, 402, and 403; whether portions of his testimony will be of assistance to the jury under Rule 702 in determining any issue in the litigation; and whether some of his proposed testimony crosses the line into inadmissible character evidence under Rule 404(a).

Government counsel argues that these opinions are being offered to prove an issue in the litigation other than mens rea.[2] Specifically, the government counsel states:

> Finally, Dr. Dietz will offer expert conclusions based on his education, training and experience, with reasonable medical certainty. (Dr. Dietz's Report, p. 108-113). This section includes the paragraph that Defendant Bagley cites and the court inquires about in the order issued. However, Dr. Dietz's conclusions that Defendant Bagley is a "sexual sadist" and that he can be "fairly characterized as a psychopath" do not offer an expert opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. (Dietz's Report, p. 108). Indeed, as Dr. Dietz outlines in his report, many people who are properly characterized as sexual sadists . . . do not

---

[2]Usually, we encounter expert psychiatric or psychological testimony like this when a defendant raises an issue of insanity or diminished mental responsibility. Rule 12.2 of the Federal Rules of Criminal Procedure requires defense counsel to file a pretrial notice that the defendant intends to introduce expert testimony on his or her mental condition. We have no such motion here. Indeed, everyone agrees that Dr. Dietz's testimony, as outlined above, is not being offered to prove an issue dealing with a defendant's mens rea. And yet, the doctor's report is peppered in the conclusions section with words and phrases such as "willfulness"; "reckless disregard"; "defendants had knowledge of at least some of [female complainant's vulnerabilities]"; "[t]hey took advantage of her knowing that she was immature, mentally impaired, and a victim of prior sexual abuse"; "despite their knowledge of [female complainant's] vulnerabilities, having good reason to doubt that she could competently consent." (Dietz Report, pages 108-13).

9

commit the acts the defendant is charged with in the indictment. Dr. Dietz's diagnosis does not instruct the jury that the defendant is guilty of the criminal acts charged [or] an element in which they must make a finding of fact. Rather, it educates the jury that while new torture techniques and images of bondage and mutilation are not of value to them, or the average person, they are high value to someone who is a sexual sadist and has a sexual appetite for these behaviors.

This argument is premised on the government's burden to prove that defendant received a "thing of value" to establish that the sexual acts were commercial.

To the average juror or individual, receiving new tips and techniques on how to torture someone or images which depict the acts, is not a "something of value." But to someone who is a sexual sadist combined with being a psychopath, there could be no greater item of value. Whether an item received is a "thing of value" is a subjective standard based on proving that the person who received it would value it.

My review of Dr. Dietz credentials failed to turn up any education, training, or experience to suggest that the doctor has any special expertise on a "thing of value."

Even assuming that Dr. Dietz could qualify as an expert on a "thing of value," there seems to be little need for such testimony in this case given the government's available evidence. Here are some examples of the underlying evidence recounted in the Dietz Report: "Marcus told Bagley that he 'could make some money' selling photos to a magazine" (Dietz Report, page 18); "[female complainant's] income at the club came from dancing as well as from autographing photographs and magazines in which she appeared" (Dietz Report, page 19); "[female complainant] earned from $1200.00 - $2000.00 nightly" (Dietz Report, page 19); "Bagley was contacted by Ira Levine and Matthew Brand, who represented Hustler magazine and wanted to write an article for Hustler's Taboo publication" (Dietz Report, page 22); Bagley and [female complainant] returned to California to meet with representatives of the pornography industry because [female complainant] wanted to pursue an opportunity to appear in pornographic movies" (Dietz Report, page 22); "Bagley talked about how much money the 'master' in the videos was making and said he wanted to earn that kind of money" (Dietz Report, page 25); "Henry would estimate that it would cost at least $25,000 - $30,000 to buy that much [BDSM] equipment" (Dietz Report, page 35); Stokes acknowledged providing Bagley 'gifts' and once gave him $300.00 to construct a

10

'fucking machine'" (Dietz Report, page 37); and "Bagley talked about making money online with a website in which people would pay to watch [female complainant]" (Dietz Report, page 37).

Given the direct evidence about the alleged conduct here involving a "thing of value," it is difficult to see how Dr. Dietz could offer any testimony that would "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702.

C. **HOW THE DEFENDANTS WERE ABLE TO TREAT THE VICTIM AS THEY DID FOR SO LONG WITHOUT HER CALLING THE POLICE, SEEKING HELP, OR ESCAPING THE SITUATION**

In this section of the report, Dr. Dietz answers the government's second question and describes a number of conditions from and practices by which sex offenders typically select and groom their victims to participate in the alleged illegal and violent conduct, and at the same time prevent them from contacting the authorities or escaping the abuse. The doctor recounts the factors identified by the National Center for Victims of Violent Crime and the Center for Family Violence Prevention, and then compares these factors with the evidence here. (Dietz Report, pages 70-90.)

This section also raises questions about the admissibility of at least some of the doctor's testimony. For example, in the section entitled "Victim Vulnerability," the doctor states that "[Female complainant's] vulnerabilities were well known to Bagley before he even invited her into his household" and that "Marilyn Bagley, too, knew of her vulnerability . . . ." (Dietz Report, page 71.)

In the opinions section of the report, Dr. Dietz discusses "Bagley's success at preventing [female complainant] from contacting authorities or leaving him," recounts the victim's vulnerabilities, and then states:

> [Female complainant's] many vulnerabilities were so apparent that each of the defendants had knowledge of at least some of them and had reason to question her capacity to consent to sexual contact, much less torture. They took advantage of her knowing that she was immature, mentally impaired, and a victim of prior sexual abuse (including Bagley's abuse of her).

11

(Dietz Report, pages 110.)

The courts have held that expert testimony is admissible on issues such as the selection, grooming, and control of victims of violence. United States v. Batton, 602 F.3d 1191, 1200-1202 (10th Cir. 2010), includes an informative discussion:

> The district court concluded it would allow Dr. Heineke to testify, but only about the characteristics of sex offenders and their victims to dispel any of the jurors' misconceptions that the only people who commit sexual offenses are strangers, not trusted family members or friends. The trial court emphasized that Dr. Heineke was not to offer any opinions about how his testimony might relate to the facts of Batton's case, nor was he to offer any opinions about the credibility of witnesses.
>
> Batton argues that even with those limitations in place, Dr. Heineke's testimony was nothing more than improper "profile" evidence. Batton contends the testimony did nothing but frame the way the jury saw the evidence that followed and how it perceived Batton.
>
> We disagree. We have previously allowed testimony regarding criminal methods that are beyond the common knowledge of lay jurors. "Expert testimony is properly admitted if the subject matter is closely related to a particular profession, business or science and is not within the common knowledge of the average layperson." United States v. Kunzman, 54 F.3d 1522, 1530 (10th Cir. 1995). See United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991) (allowing an expert to testify regarding the specific practices of the drug trade, about which lay jurors might have misconceptions). Our reasoning for this is rooted in Federal Rule of Evidence 702: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form on an opinion or otherwise.
>
> Thus, we have declined in the past to classify "evidence into categories of profile or nonprofile." Rather, we have focused our inquiry on whether the "specialized knowledge . . . will assist the trier of fact in understanding the evidence."
>
> Dr. Heineke testified that sex offenders are generally not strangers to their victims and their families but are more often than not close family members, friends, or well-respected individuals in a community who often use their positions to groom their victims into trusting them. He also informed the trial court that many lay persons carry a common misconception that sex offenders are only strangers or fit some misconceived criminal caricature. This specialized information may very well be beyond the knowledge of many jurors. See Robin Fretwell Wilson, Undeserved Trust: Reflections on the ALI's Treatment of De Facto Parents, in Reconceiving the Family: Critique of the American Law Institute's Principles of the Law of Family Dissolution, 90, 117–118 (Robin Fretwell Wilson, ed., 2006) (showing that many of the behaviors legal doctrines equate with good parenting are the same behaviors used by child molesters to groom their victims, including reading to children and bathing, dressing, disciplining, and showering children with attention and gifts); Jon R. Conte, The Nature of Sexual Offenses Against Children, in Clinical

Approaches to Sex Offenders and Their Victims (Clive R. Hollin & Kevin Howells eds., 1991) (explaining many of the techniques sex offenders use to groom their victims).

Other circuits have reached a similar conclusion. For example, in United States v. Romero, 189 F.3d 576 (7th Cir. 1999), the Seventh Circuit held that contemporary expert testimony regarding the modus operandi of child molesters was admissible. Id. at 585–87. In Romero, the defendant was charged with kidnaping and transporting a minor with the intent to engage in criminal sexual activity. The trial court allowed expert testimony regarding the practices of child sex abusers to dispel "from the jurors' minds the widely held stereotype of a child molester as a 'dirty old man in a wrinkled raincoat' who snatches children off the street." Id. at 584. The Seventh Circuit approved the trial court's decision, noting that the expert testimony showed the sex abusers' grooming techniques. Id. at 585. Most notably, the testimony "illuminated how seemingly innocent conduct such as [the defendant's] extensive discussions . . . [with his victim] . . . could be part of a seduction technique." Id.

Similarly, the Fifth Circuit in United States v. Hitt, 473 F.3d 146 (5th Cir. 2006), held that the admission of expert testimony regarding the modus operandi of child molesters, including grooming, was not an abuse of discretion. Id. at 158. As in other cases we have discussed, in Hitt, the defendants were charged with transporting a minor across state lines for the purpose of engaging in illicit sexual activity. Id. at 150. The defendants argued that such expert testimony was inappropriate character evidence and should not have been admitted. Id. at 158. The Fifth Circuit rejected that argument, noting that several other circuits also allowed testimony regarding the grooming methods of sex offenders. Id. (citing United States v. Hayward, 359 F.3d 631, 636–37 (3d Cir. 2004) (holding that expert testimony regarding the grooming techniques of child molesters was admissible)). We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders. The methods sex offenders use are not necessarily common knowledge. The trial court held a thorough Daubert hearing, where the parties discussed at length Dr. Heineke's qualifications. The record supports the trial court's determination that Dr. Heineke had sufficient expertise to discuss how sex offenders prepare their victims. Further, the trial court was careful to limit Dr. Heineke's testimony to only the correction of possible juror misconceptions regarding how sex offenders behave and what they look like. With those limitations in place, the trial court was well within its discretion to allow Dr. Heineke's testimony.

Although Dr. Dietz's anticipated testimony about the selection, grooming, and control of victims of sexual violence may well be helpful to the jury in understanding the some of the issues here, his testimony goes beyond this limited area and includes a comparison of those factors with the underlying evidence here (which, in some circumstances and under specific conditions, may also be admissible), and his opinions about what the defendants knew and what they willfully participated in or allowed to continue. (Dietz Report, pages 111.)

13

D.   THE BDSM SUBCULTURE

In this section of the report, Dr. Dietz answers the prosecutor's third question and describes the norms and safety rules for BDSM activities as drawn from websites, manuals, and persons who have participated in the BDSM subculture and are familiar with defendant Bagley's treatment of the female complainant. (Dietz Report, page 90.) For example, the doctor relies on several sources (e.g., STL3 website; the National Coalition for Sexual Freedom; *Learning the Ropes: A Basic Guide to Safe and Fun S/M Lovemaking*) to arrive at "the universal code of the BSDM subculture." (Dietz Report, pages 90-97.) The doctor then takes the "universal code" and applies it to the evidence here, some of which may raise the same evidentiary questions discussed in the earlier portions of this report and recommendation.

The conclusions section also raises questions about the admissibility of some of Dr. Dietz's opinions. For example, one of his conclusions states:

> Participants in the BDSM subculture who became familiar with Bagley's abuse of [female complainant] - including Michael Yoshida, Jerry Dean Shaddy, Roy Wollstrum, Ken Marcus, and Ira Levine - were each concerned, disapproving, or appalled by Bagley's conduct toward [female complainant] and his violations of subculture norms.

(Dietz Report, page 112.) Assuming these people are called to testify in accordance with this assertion, thereby alleviating the obvious hearsay problem, there remains a question as to whether this testimony is truly helpful to the jury, or merely objectionable argument best left for government counsel to make during summation.

The conclusions section on BDSM also includes statements that may raise concerns about invading the province of the jury. For example, Dr. Dietz opines that "Bagley's transformation of [female complainant] into his subservient sex slave included indoctrination into what he misled her into believing was 'the BDSM lifestyle' and replacing her identity with the identity of 'Slave [Name]'." (Dietz Report, page 111.)

14

The government argues that Dr. Dietz's testimony will be helpful to the jury in understanding the evidence of BDSM including what conduct is appropriately accepted within the rules and regulations of the BDSM lifestyle and what conduct "clearly exceeds the boundaries of this subculture." The government states that this testimony by Dr. Dietz is based on the defendants' statements that they intend to argue that their conduct was simply a part of the BDSM lifestyle.

In United States v. Marcus, 628 F.3d 36, 45 (2nd Cir. 2010), Marcus was charged with sex trafficking and forced labor. Because the sex trafficking conduct predated the effective date of the criminal statutes under which Marcus was charged, only the forced labor count could result in a conviction. Marcus had engaged in a BDSM relationship with the victim whom he then forced to maintain a BDSM website he operated for profit. At some point, the consensual nature of their relationship changed and Marcus began inflicting unwanted punishment on the victim, recording it, and putting it on his website. He forced her to write fantasy diary entries for the website indicating that she enjoyed the torture that was depicted in the recordings. The trial court gave the following instruction to the jury:

> Throughout the trial, you have heard evidence about sexual practices called Bondage, Discipline/Domination, Submission/Sadism, Masochism, or "BDSM," that may involve actual physical restraint, such as being tied up or placed in a cage. The mere fact that a person was physically restrained during the course of such acts does not necessarily mean that the statute was violated. For example, if the physical restraint was consensual, then it would not constitute a violation of the statute.
>
> It is for you to decide, based on a careful consideration of all the facts and surrounding circumstances, whether the acts of physical restraint violated the statute.

Id. at 45 n. 11.

In challenging this instruction, Marcus argued that the "labor or services" phrase in the forced labor statute did not include work on the website for which Marcus derived pecuniary gain. He compared it to domestic chores performed by any co-habitating couple, including one who might have an abusive partner. Instead, he argued, the forced labor statute was intended to

proscribe international trafficking in slave labor and prostitution. He also argued that the "punishments" he inflicted on the victim "are inseparable from the BDSM activities that were a long standing part of their intimate relationship."

The court disagreed:

> The jury was properly instructed that consensual BDSM activities alone could not constitute the basis for a conviction under the sex trafficking charge, and there is no reason to believe that the jury did not understand this instruction to be equally true with respect to the forced labor charge. The jury rejected Marcus's view of the affair, namely, that Jodi's work on the website and punishments relating thereto were all part of her long-time intimate relationship with Marcus and their broad participation in BDSM. Moreover, the evidence fully supports the Government's theory that, over time, the violence Marcus inflicted upon Jodi became nonconsensual, the punishments became more severe, and that Jodi would not have performed services for Marcus's website had she not feared that noncompliance would result in future physical and sexual abuse. The fact that Jodi's enslavement arose from her initial participation in consensual BDSM activities does not require a contrary conclusion.

Id. at 45.

Although Dr. Dietz's anticipated testimony about BDSM may well be helpful to the jury in understanding the some of the issues here, his testimony goes well beyond a description of this subculture and includes a comparison of BDSM rules with the underlying evidence here (which, in some circumstances and under specific conditions, may be admissible), and his opinions about what the defendants knew and what they willfully participated in or allowed to continue. (Dietz Report, pages 111.)

## IV. CONCLUSION

Because it is clear that the court will need to address a number of important issues about the admissibility of testimony from Dr. Dietz, it is

RECOMMENDED that the government be ordered to promptly marshal the information in the Dietz Report in a detailed written form so that the court and the remaining defendants for trial know: (1) the issue to which each opinion is addressed; (2) the doctor's specific opinion to be given at trial; (3) the doctor's specific credentials qualifying him to render such an opinion; (4) the admissible facts upon which the doctor's opinion is based; (5) if any of the underlying facts

16

for the doctor's opinion are inadmissible, how they are the type reasonably relied upon by experts in the field; (6) how the doctor's proposed opinion will assist the jury in resolving the issue in dispute; and (7) any cautionary or limiting instructions that government suggests that the court give to deal with potentially prejudicial testimony.³  It is further

RECOMMENDED that, after the government files its written report in the approved form, the court direct that the government and remaining defendants for trial promptly file any motions in limine or supplementary materials dealing with the admissibility of Dr. Dietz's testimony as set forth in the new format⁴.  It is further

RECOMMENDED that the court take under advisement defendant's request for funding for a psychiatrist to review Dr. Dietz's report. Once the court issues rulings on the admissibility of the evidence the government intends to offer through Dr. Dietz, it will be in a position to determine whether approval for defendant's requested funding should be sought from the Court of Appeals. It is further

RECOMMENDED that, because there is a short window of time between now and the February 13, 2012, trial setting, the court shorten the number of days within which the parties

---

³The structure of the current Dietz Report simply does not allow the court to make the type of informed analysis that is required by Daubert and the evidentiary rules. Similarly, an evidentiary hearing with Dr. Dietz present would not necessarily result in any improvement in the government's organization of this material, and could generate more questions than answers.

⁴Counsel for the government is advised to cite cases for their holding only unless a reference to dicta is being made, and in that case the citation should include the "dicta" notation. Citing a case which neither rules nor mentions the legal precedent discussed is inappropriate. See p. 11 of the government's response (document number 230) where the government cites to United States v. Barkau, 643 F.3d 1060 (8th Cir. 2011) and United States v. Elbert, 561 F.3d 771 (8th Cir. 2009) to support the legal argument that, "Even in our own district, defendants have previously been convicted when the item of value received was something of value other than cash." There is no mention of the items cited by the government as having been received by the defendants in those cases. In fact, the Elbert case does not even mention the co-defendant whom the government claims received a "thing of value" in that case. AUSA Cynthia Cordes was involved in both of those cases, and I assume the government's brief in this case was based on her knowledge of the facts of those other cases. However, the Court of Appeals made no such holding and in fact did not even address the legal principal for which those cases are cited.

17

Case 4:10-cr-00244-DW   Document 256   Filed 12/27/11   Page 17 of 18

have to object to this Report and Recommendation, and enter a scheduling order setting forth deadlines for the government to file its revised report on Dr. Dietz's testimony, and for the parties to file in limine motions and supplementary material dealing with Dr. Dietz's testimony.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 27, 2011